Filed 3/12/25  P. v. Johnson CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KERRY JOHNSON,<br><br>    Defendant and Appellant. | B330079<br><br>(Los Angeles County<br>Super. Ct. No. NA114628-01) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Deborah S. Brazil, Judge.  Affirmed.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Assistant Attorney General, Scott A. Taryle and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Kerry Johnson appeals from his judgment of conviction of first degree murder with a sodomy-murder special circumstance (Pen. Code[1] §§ 187, subd. (a), 190.2, subd. (a)(17)(D)) and forcible sodomy (§ 286, subd. (c)(2)(A)). He argues that the trial court erred in failing to instruct the jury or grant a mistrial regarding the prosecution's alleged failure to disclose the full scope of a rebuttal expert's testimony. Johnson also asserts that the trial court erred in failing to conduct an in camera review of one of the victim's mental health records, and that the cumulative effect of the alleged errors requires reversal. We conclude that none of Johnson's claims has merit and accordingly affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.    Charges

In an amended information, the Los Angeles County District Attorney's Office charged Johnson with crimes against two different victims. In count 1, Johnson was charged with the first degree murder of Kathy Brown (§ 187, subd. (a)), with a special circumstance allegation that the murder was committed while engaged in the crime of sodomy (§ 190.2, subd. (a)(17)(D)). In count 2, Johnson was charged with the sodomy of Devorah H. by means of force, violence, duress, menace, or fear of bodily injury (§ 286, subd. (c)(2)(A)).

### 2.    Prosecution's case-in-chief

#### 2.1    Count related to Devorah

Johnson was a resident at an assisted living home. He required the use of a walker to move around. On June 3,

---

[1]    Unless otherwise stated, all further undesignated statutory references are to the Penal Code.

2020, then 68-year-old Devorah moved into the residence, and was assigned to an available bedroom. Devorah also used a walker because she previously sustained a fractured pelvis and tailbone. According to the daytime managers of the house, Avelino and Ludivina Acedo, Johnson helped Devorah buy some shirts shortly after she arrived.

At about 6:00 p.m. that evening, as Devorah was lying on her bed, Johnson entered her room and locked the door. He got into the bed, grabbed Devorah from behind, and pulled down her pants and underwear. Johnson then sexually assaulted Devorah by inserting his penis into her rectum. Devorah screamed and scratched Johnson's face with her fingernails. In response, Johnson placed his hand over Devorah's nose and mouth, causing her to lose consciousness. At some point, Johnson and Devorah fell onto the floor, where he continued to forcibly sodomize her. During the assault on the bed and the floor, Johnson was on his right side. Devorah estimated the assault lasted one hour, and ended when Johnson appeared to ejaculate. Johnson did not use a condom or lubricant during the assault.

After the assault, Johnson crawled toward his walker and lifted himself up. Before leaving the bedroom, he told Devorah, "If you tell anyone, I'm going to kill you." As soon as Johnson left, Devorah went to find the house managers, and told them that Johnson sexually assaulted her. In response, the Acedos contacted the owner of the home, Gloria Caseda, and Devorah was transferred to another residence.

About nine and a half hours after the assault, Devorah went to the hospital for a sexual assault forensic exam. At the hospital, Devorah reported that she had pain in her back and rectum. She also reported that she washed her anal and genital

3

areas after the assault. The nurse who conducted the exam observed bruising on Devorah's right back, right hip and left leg. The nurse further observed redness and tenderness in Devorah's rectal area, and opined that the redness could be consistent with forcible sodomy. The nurse did not observe any tears or bleeding in Devorah's anal or rectal area, or semen on her body. Although Devorah testified that the nurse told her during the exam that her rectum "was tore up and bleeding," the nurse denied ever making this statement or finding.

Following his arrest, Johnson also underwent a forensic exam at the hospital. During the exam, the nurse did not observe any scratches on Johnson's face or any recent injuries on his body.

A DNA analysis was performed on evidence collected from the forensic exams. Johnson's DNA was found on Devorah's right fingernails. No male DNA was detected on Devorah's anal or rectal area, and no semen was found on her clothes or bedding.

### 2.2 Count related to Brown

On June 3, 2020, the date of Devorah's sexual assault, then 66-year-old Brown was a resident at the same assisted living home. The nighttime manager, Jorlene Donozo, started her shift at 8:00 p.m., and at some point, noticed Brown was missing. Donozo and her boyfriend began searching the home for Brown.

The door to Johnson's bedroom was locked, and no one answered when Donozo first knocked on it. After Donozo knocked a second time, Johnson's roommate, Eric Williams, opened the door. Williams was fully dressed and standing near the door when it opened. Johnson and Brown were lying close together on the floor. Brown was partially covered with a blanket, and her pants were pulled down. Johnson's pants were

4

also pulled down, and he appeared to be having sexual intercourse with Brown. When Donozo asked what they were doing, Johnson repeatedly stated, "Don't tell Gloria." He also pulled Brown's arm while trying to hide her under the blanket. Brown was not moving.

Donozo called the owner of the house, Caseda. After Caseda arrived, the police were called. When paramedics responded to the residence, Brown was nonresponsive, and she was pronounced dead at the scene. The cause of death was strangulation. Brown suffered trauma to the neck and fractures to her hyoid bone and thyroid cartilage.

A DNA analysis was performed on evidence collected from Brown, Johnson, and Johnson's roommate, Williams. Williams was a low level contributor of DNA recovered from Brown's neck. No semen was detected on Brown's clothing or body, and no male DNA was found on Brown's anal, rectal, or genital areas. Johnson's DNA was not detected in any of the samples taken from Brown. However, Brown's DNA was found on Johnson's scrotal area.

### 2.3    Johnson's statements to the police

Long Beach Police Officer Miriam Leserman arrived at the scene shortly before 11:00 p.m. She saw Johnson standing around a courtyard outside the house. Johnson approached the officer and began talking to her. According to Officer Leserman, Johnson said that he had been in his bedroom earlier that evening with two other people. One of them was a woman who was smoking a cigarette at the window. The woman began coughing and fell to the ground. Johnson tried to wake her by pulling on her arm. Someone told Johnson to drag the woman

5

out of the room, and as he was doing so, her pants started to come off.

According to Officer Leserman, Johnson also described having sex with another woman. Johnson said that he had "big serpent" stuck in his pants, that the head was pointed up at him and kept getting bigger, and that he had to take off his clothes. Johnson then said that he could not get pregnant, but he could fertilize eggs. When Officer Leserman asked Johnson if he fertilized any eggs that day, he referred to a woman who was no longer at the residence. He said that the woman wanted to "test out his wrath" and be with "a real ghetto boy," and that they connected because they were both handicapped.

While Officer Leserman was speaking with Johnson, Long Beach Police Officer Amanda Aknin arrived. Officer Aknin was wearing a body camera, and a portion of her conversation with Johnson was recorded and played for the jury. As Officer Leserman was describing Johnson's statement to Officer Aknin, Johnson interjected that he had sex with a "lady that came through." He also said that he bought her a shirt. When Officer Aknin asked if the woman consented to sex, Johnson replied, "No. She didn't consent. I just . . . muscled my way to what I want. You see me walking like this, man, I'm 69 years old and beat up. I get lucky once in a while. I ain't got many more years and I'm gonna tell you, if you make a mistake, I got you. You know. And that's you, and any other lady. I ain't got that many more years to do that, you know, and as long as I can, if you make a mistake, or . . . you let me have it, I'm gonna have it." Officer Aknin again asked Johnson if the woman agreed to have sex with him. In response, Johnson stated, "You think I'd sit here and tell you

I had sex with a lady, and she didn't agree to it? Do you really think I'll bring it up? Am I that stupid?"

### 3. Defense evidence

Dr. William Stetson, an orthopedic surgeon, testified as an expert for the defense. Dr. Stetson reviewed Johnson's medical records and videos documenting his mobility. As described by Dr. Stetson, Johnson was struck by a car in 2018, and suffered multiple serious injuries, including fractures to his right arm, shoulder, and leg, his mid and lower back, and both hips. As a result, Johnson had residual partial paralysis in his back and legs, and required a wheelchair or walker to get around. He also had limited ability to use his right arm and shoulder, or to lie on his right side for a significant period of time. Dr. Stetson opined that, while Johnson was physically able to have sex, it was unlikely that he could do so for one hour while lying on his right side.

Dr. Theodore Hariton also testified for the defense as an expert in forensic gynecology. He reviewed the medical reports on the sexual assault forensic exams conducted for Devorah and Brown. With respect to Devorah, Dr. Hariton testified there was no medical evidence that she was anally penetrated. According to Dr. Hariton, if a postmenopausal woman like Devorah suffered nonconsensual anal penetration for one hour, the exam would show evidence of bruising, abrasions, swelling, or tears in the anal or rectal areas. However, Devorah's exam showed no injury to her anus or rectum. Dr. Hariton further testified that, while redness in the anal or rectal areas could be a sign of friction, it was not a sign of sexual injury. With respect to Brown, Dr. Hariton similarly testified there was no medical evidence of sexual assault because Brown's autopsy showed no injury to her

vaginal or anal areas. If either vaginal or anal penetration without consent occurred, the expected findings on a sexual assault exam would include swelling, bruising, abrasions, or tears. Dr. Hariton testified that the absence of male DNA on Brown's anal, rectal, and genital areas further supported his opinion that she was not sexually penetrated.

On cross-examination, the prosecutor asked Dr. Hariton if he ever heard the phrase "traumatic response to a crisis." Dr. Hariton testified that he heard the words before, but did not know what the phrase meant. He agreed, however, that a traumatic event like rape can "affect different people in different ways." He acknowledged that a traumatic event might affect a person's memory and perception of time, such as a rape victim believing the assault lasted a long time when the actual duration was very short. Dr. Hariton also testified that both men and women can suffer forcible anal penetration without any physical injury. He explained that there are no recognized studies showing how often forcible anal penetration results in an injury because there are different factors involved that are individual to each victim.

4.    **Prosecution's rebuttal evidence**

On rebuttal, the prosecutor called Malinda Wheeler to testify as an expert on sexual assault. Wheeler was a registered nurse and the owner of a business that contracts with law enforcement and government agencies to conduct sexual assault forensic exams. In the past 29 years, she performed approximately 900 sexual assault exams herself and provided training in numerous other cases. When the prosecutor asked if she ever heard the phrase "traumatic response to a crisis," Wheeler replied that it referred "to a new field in science and

8

psychology." She then explained that in her personal experience of seeing sexual assault victims, "the emotional and psychological response varies greatly from person to person." Wheeler opined that a traumatic event such as rape can affect a person's memory and perception of time, and can cause a more heightened emotional state when the event is recent. In addition, after a sexual assault, even a slight amount of pressure to the external sphincter can be perceived as very painful based on the person's psychological response to trauma. Whether forcible anal penetration results in an injury depends on a number of different factors, including the age and health of the victim, the degree of force used, the length of the assault, and the amount of any resistance. In the sexual assault cases that Wheeler studied, anal penetration caused a physical injury about 30 percent of the time.

On cross-examination, Wheeler acknowledged that she was not relying on any scientific articles or research to support her testimony. Rather, Wheeler was basing her opinions on the examinations that she conducted and the cases that she reviewed over the years.

5. **Jury verdict and sentencing**

At the conclusion of the trial, the jury found Johnson guilty of the first degree murder of Brown and the forcible sodomy of Devorah. The jury also found true the special circumstance allegation that the murder of Brown was committed while Johnson was engaged in the crime of sodomy. The trial court sentenced Johnson to life in prison without the possibility of parole, plus a consecutive term of 25 years to life.

Johnson filed a timely appeal.

## DISCUSSION

### 1.     The prosecution's compliance with discovery

Johnson argues the prosecution violated its discovery obligations when it failed to timely disclose the full scope of its rebuttal witness's testimony.  He asserts the trial court abused its discretion and violated his constitutional rights in refusing to either instruct the jury on the prosecution's late disclosure or to grant a mistrial based on the discovery violation.  We conclude the trial court did not err in finding that the prosecution complied with its discovery obligations, and even if there was error, it was harmless under the circumstances of this case.

#### 1.1     Relevant proceedings

Trial commenced on March 7, 2023.  At a pretrial hearing held on February 1, 2023, defense counsel informed the trial court that he was still awaiting discovery regarding the People's anticipated expert, Wheeler, and that the prosecutor indicated a written report was forthcoming.  The prosecutor confirmed that Wheeler was reviewing the records provided by the defense, and that the prosecutor had requested the completion of a report within a week.

On February 27, 2023, the defense filed a motion to compel discovery regarding Wheeler.  The motion requested that the court compel the prosecution to provide "a detailed report from Ms. Wheeler explaining the conclusions and opinions that will encompass [her] testimony, as well as a statement of the reasons supporting her conclusions and opinions."  In support of the motion, defense counsel attached a one-paragraph e-mail that Wheeler sent the prosecutor in response to her request for a written report.  Wheeler's e-mail stated:  "I do not recall ever having to write a report for one of our own sexual assault cases.

I will not be 'relying' on any scientific research or articles for my opinion, but my 29 years of training and education, and seeing sexual assault victims, and reviewing thousands of photos and cases in review. My testimony will basically be that injury can occur in some people with reported anal penetration, and then not in others. When I start my examination with any patient I do not have any expectation of an injury. Of course this is a general statement and it could be influenced by the history. For example, if the patient stated, 'I started bleeding from my vagina after he raped me'—I would expect the possibility of an injury to be present but not always. It could be her normal menstrual cycle which she may not realize because of the stress of the trauma. The patient's perception of how their body reacted during a trauma does not always present to a medical professional with obvious consistency."

At a February 27, 2023 pretrial hearing, the trial court discussed the discovery motion with the parties. The prosecutor noted that Wheeler's curriculum vitae was provided to the defense. The prosecutor also stated that Wheeler did not prepare a written report because she was not relying on scientific tests or methods, but rather on her own experience in conducting sexual assault exams where there are sometimes cases of anal penetration without a resulting injury. Defense counsel responded that the relevant issue was not whether anal penetration can occur without injury, but whether "a 60-minute assault without consent with no lubrication [is] going to result in injury." Defense counsel asserted that he was entitled to know the basis for Wheeler's opinion on that issue. The court explained to defense counsel that it could not order Wheeler to produce a report that did not exist, and that it had "nothing to

order the People to give to you." The court added that it would consider holding an Evidence Code section 402 hearing at the appropriate time.

Prior to the start of the prosecution's rebuttal case, defense counsel raised the scope of Wheeler's testimony with the trial court. After recounting his prior efforts to obtain a written report from Wheeler, defense counsel asked the court to review her one-paragraph e-mail to the prosecutor describing her proposed testimony. Defense counsel stated that "if the witness exceeds the scope of that paragraph," he intended to object on the basis of a discovery violation.

After reviewing Wheeler's e-mail, the court noted that her proposed testimony appeared to be within the proper scope of rebuttal. The court asked the prosecutor what evidence she intended to elicit from Wheeler. The prosecutor explained that she planned to ask Wheeler the same questions she asked the defense expert, Dr. Hariton, regarding "anal penetration, traumatic condition of somebody's response to a crisis," and how often Wheeler found no injury in cases of forcible penetration. When defense counsel asserted that "traumatic response to crisis is something brand-new," the court disagreed, noting that the subject was raised by the prosecutor during her cross-examination of Dr. Hariton. Defense counsel also argued that the concept of traumatic response to a crisis sounded "like a technical term," and if he had been properly apprised of the concept, he could have reached out to appropriate experts. Defense counsel asked for a brief Evidence Code section 402 hearing to allow him to question Wheeler about this subject.

The court denied defense counsel's request. The court explained that Wheeler's proposed testimony involved a "very

12

brief rebuttal," and that the concept of differing reactions to traumatic events "has been inquired throughout this trial by both counsel." The court further noted that "it is in fact a commonsensical layperson opinion [that] somebody might shut down during a traumatic event," and that "a traumatic evidence for one person may not be a traumatic event for another person." The court then allowed the prosecutor to call Wheeler as a rebuttal witness.

On cross-examination, defense counsel asked Wheeler when she discussed the concept of traumatic response to a crisis with the prosecutor. Wheeler replied that she and the prosecutor talked about the concept that week, but she could not recall if they had earlier conversations about it. Defense counsel also asked Wheeler whether she discussed that concept in her one-paragraph e-mail to the prosecutor describing her proposed testimony. In response, Wheeler pointed to the last line of that paragraph, which stated, " 'The patient's perception of how their body reacted during a trauma does not always present to a medical professional with obvious consistency.' " Wheeler explained that sentence alluded to the trauma response concept because "how the body perceives the trauma and how the body reacts can be their physical body as well as their psychological."

During the conference on jury instructions, defense counsel asked the court to instruct the jury with CALCRIM No. 306 regarding late discovery. Defense counsel argued that Wheeler's testimony exceeded the scope of her e-mail, which left the defense unable to appropriately respond to her new assertions regarding the concept of traumatic response to a crisis. The prosecutor responded that the concept was encompassed in the last line of Wheeler's e-mail, and that it was appropriate for the People to

13

ask Wheeler the same questions that they asked the defense expert.

The court denied defense counsel's request for a jury instruction on late discovery. The court explained that Wheeler was a rebuttal witness, and that the lack of forensic evidence to support Devorah's account of the alleged sexual assault had been at issue since the start of trial. The court also noted that defense counsel described the case in his opening statement as one of "statement versus science," and that over the course of the trial, he examined the witnesses, including the experts, about whether a sexual assault could have occurred for the length of time and in the manner described by Devorah. The court stated that it did "not believe that the People intentionally, or unintentionally, sandbagged the defense or failed to fulfill their discovery obligations." Defense counsel then moved for a mistrial on the same ground, and the court denied the motion.

### 1.2    Governing law

Section 1054.1 requires the prosecution to disclose to the defense certain categories of evidence, including the "[r]elevant written or recorded statements of witnesses," and the "reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case." (*Id.*, subd. (f); see *People v. Suarez* (2020) 10 Cal.5th 116, 167.) " 'Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered . . . within 30 days of trial. (§ 1054.7.)' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 280.) Section 1054.1's disclosure requirements also apply to rebuttal witnesses. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 513.) In addition, some appellate courts have interpreted section 1054.1 to require the

14

disclosure of unrecorded oral statements of witnesses as well as written ones.  (See *People v. Hughes* (2020) 50 Cal.App.5th 257, 280; *Roland v. Superior* Court (2004) 124 Cal.App.4th 154, 160.)

"Upon a showing both that the defense complied with the informal discovery procedures provided by the statute, and that the prosecutor has not complied with section 1054.1, a trial court 'may make any order necessary to enforce the provisions' of the statute, 'including, but not limited to, immediate disclosure, . . . continuance of the matter, or any other lawful order.'  (§ 1054.5, subd. (b).)  The court may also 'advise the jury of any failure or refusal to disclose and of any untimely disclosure.' "  (*People v. Verdugo*, *supra*, 50 Cal.4th at p. 280.)  The court may prohibit the testimony of a witness only if all other sanctions have been exhausted.  (§ 1054.5, subd. (c).)

We review the trial court's ruling on whether a discovery violation occurred for abuse of discretion.  (*People v. Thompson* (2016) 1 Cal.5th 1043, 1105; *People v. Ayala* (2000) 23 Cal.4th 225, 299.)  Even where the prosecution fails to comply with its discovery obligations, "[a] violation of section 1054.1 is subject to the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 []."  (*People v. Verdugo*, *supra*, 50 Cal.4th at p. 280.)  To demonstrate reversible error, the defendant " 'must establish that " 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.' " ' "  (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960.)  "To the extent the denial of discovery implicated defendant's federal due process rights [citation], the applicable test is whether the error is harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18 [].)"  (*Id.*, at p. 961.)

15

### 1.3 The trial court did not err in finding there was no discovery violation, and even if it did, the error was harmless

Johnson contends the prosecution violated its discovery obligations when it failed to timely disclose that its rebuttal expert, Wheeler, would testify about the concept of traumatic response to a crisis. Johnson claims the trial court should have provided a remedy for this violation either by instructing the jury with CALCRIM No. 306 on the prosecution's untimely disclosure of evidence, or by granting the defense motion for a mistrial. He further asserts the trial court's alleged error in failing to provide a proper remedy violated his constitutional right to a fair trial, due process, and effective assistance of counsel. We conclude the trial court neither abused its discretion nor violated Johnson's constitutional rights in finding there was no discovery violation.

On this record, the trial court reasonably could find that the prosecution complied with its discovery obligations under section 1054.1 regarding Wheeler's testimony. First, the court properly denied Johnson's pretrial motion to compel the discovery of a written report from Wheeler that detailed her opinions and conclusions. As the court explained in denying that request, it could not order the prosecution to produce a written report that did not exist. Second, the court reasonably could find that the prosecution disclosed the scope of Wheeler's rebuttal testimony, including the concept of traumatic response to a crisis, when it provided the defense with a copy of the one-paragraph e-mail from Wheeler describing her proposed testimony. The e-mail explained that Wheeler did not intend to rely on any scientific research or articles for her opinions, but rather on her personal experience in treating sexual assault victims and reviewing

16

sexual assault cases.  The e-mail summarized Wheeler's planned testimony that "injury can occur in some people with reported anal penetration, and then not in others."  It also described how psychological trauma from a sexual assault may affect the victim's perception of the assault and its impact on their body.  The e-mail provided an example, stating that "because of the stress of the trauma," a woman may not realize that the vaginal bleeding she experienced after a rape was not the result of an injury, but rather due to her regular menstrual cycle.  The e-mail further explained that a victim's "perception of how their body reacted during a trauma does not always present to a medical professional with obvious consistency."

Prior to the People's rebuttal case, defense counsel argued that Wheeler should not be allowed to testify on the subject of "traumatic response to a crisis" because it was a "brand-new" theory.  However, as the trial court noted, the concept that different people might have different reactions to a traumatic event such as a sexual assault was not "brand-new," but rather was explored during the defense expert's testimony.  In his direct testimony, Dr. Hariton opined that Devorah was not sexually assaulted because she would have suffered an injury if she had been forcibly anally penetrated for the length of time that she claimed.  On cross-examination, the prosecutor asked Dr. Hariton if he was familiar with the phrase "traumatic response to a crisis."  While Dr. Hariton testified that he was not, he agreed that a traumatic event such as a sexual assault can "affect different people in different ways."  He also stated that it "makes sense" that a person's perception of time may be affected by a traumatic event, such as a rape victim not accurately recalling the duration of the assault.  Under these circumstances, the trial

17

court reasonably could find that the prosecution did not violate its discovery obligations regarding Wheeler's proposed testimony.

Johnson argues that Wheeler's actual testimony on the concept of traumatic response to a crisis was based on a "new scientific and psychological theory," and that the defense was unable to challenge Wheeler's opinions and conclusions because it had no prior knowledge of this theory. We disagree. During her direct examination, Wheeler did state that the phrase "traumatic response to a crisis" referred to a "new field in science and psychology." However, in response to the prosecutor's next question, Wheeler explained that she was basing her testimony about the traumatic response of sexual assault victims on her own personal experience "in seeing victims for the 29 years that I've been doing this." Indeed, Wheeler did not reference any scientific or psychological articles or research in describing how a traumatic event such as a sexual assault might affect a person's memory and perception of time. Rather, Wheeler opined that, based on her experience in treating sexual assault victims, "the emotional and psychological response varies greatly from person to person." Moreover, on cross-examination, Wheeler expressly acknowledged that she was not relying on any scientific articles or research to support her opinions in this case. She also made clear that her opinions were based solely "on the cases that [she] conducted and the cases that [she] studied over the years." Thus, contrary to Johnson's claim, Wheeler's rebuttal testimony did not rely on a new or undisclosed theory that unfairly surprised the defense.

Because the trial court reasonably determined that there was no discovery violation with respect to Wheeler's testimony, it did not err in denying Johnson's request for a jury instruction on

18

the untimely disclosure of the evidence.  Yet even assuming there was a discovery violation, Johnson cannot show prejudice under either the state or federal standard for harmless error.  Wheeler's testimony on the concept of traumatic response to a crisis was relatively brief and limited in scope.  She explained that there were significant variations in how people react to traumatic events, and that the psychological trauma of a sexual assault can affect how the victim perceives the assault and its physical impact.  The defense expert also acknowledged that responses to traumatic events vary from person to person, and agreed as a matter of common sense that the trauma of a sexual assault might affect the victim's memory and perception of time.  As the trial court observed, the concept that a person "might shut down during a traumatic event" was a "commonsensical" opinion that did not disadvantage the defense.

Further, there was compelling evidence of Johnson's guilt of the charged crimes.  Johnson told the police at the scene that he committed a sexual act with a woman who "came through" the residence and then left, and that she "didn't consent."  Within a few hours of Devorah reporting that Johnson sexually assaulted her, one of the managers of the residence found Johnson attempting to engage in a sexual act with Brown, who had been strangled to death.  Based on the totality of this record, any alleged error by the trial court in failing to instruct the jury on the untimely disclosure of evidence was harmless.

For these same reasons, the trial court did not err in denying the motion for mistrial based on the prosecution's purported discovery violation.  "In general, 'a motion for mistrial should be granted only when " 'a party's chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Bell*

19

(2019) 7 Cal.5th 70, 121.) " ' "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." ' " (*People v. Schultz* (2020) 10 Cal.5th 623, 673.) Here, the trial court acted well within its discretion in determining that the prosecution complied with its discovery obligations regarding Wheeler's rebuttal testimony, and that any alleged lack of compliance was not prejudicial.

2. **Request for an in camera review of Devorah's mental health records**

Johnson contends the trial court erred in denying his request for an in camera review of Devorah's mental health records for discoverable material related to her credibility. He claims the denial of his request deprived him of his constitutional rights to due process, to confront witnesses against him, and to present a defense. We conclude the trial court properly denied the request because Johnson failed to show good cause for an in camera review of Devorah's privileged records.

2.1 **Relevant proceedings**

On March 6, 2023, the defense filed a written motion requesting that the trial court conduct an in camera review of Devorah's mental health records and disclose relevant portions of those records. The motion asserted that Devorah's account of the alleged sexual assault was inconsistent with the forensic evidence in three areas: (1) the sexual assault exam of Devorah did not reveal any bleeding, cuts, or tears in the anal or rectal areas; (2) no semen or male DNA was detected in the anal or rectal swabs taken from Devorah; and (3) Johnson had significant restrictions on his mobility. The motion argued that these inconsistencies "lead to a reasonable conclusion that Devorah H.

20

is not being accurate in her claims of being sodomized" by Johnson, and that "[t]hese inaccuracies can be the result of a compulsion to lie and/or fabricate situations, to exaggerate incidents, and a myriad of other mental health issues related to psychotic and/or hallucinatory behavior that can be reflected in Devorah H.'s mental health records."

At a pretrial hearing held that same day, the trial court told defense counsel that it did not "see the relevance of [Devorah's] mental or psychiatric records" based on the three areas set forth in the motion. The court noted that it reviewed Devorah's conditional examination as well as Johnson's statements to the police, and that the lack of forensic evidence was not necessarily inconsistent with Devorah's account of the sexual assault. After hearing the argument of counsel, the court indicated that it would conduct a preliminary review of Devorah's records in camera to determine if there was any discoverable material.

At a subsequent hearing on the motion, the trial court explained that, based on the relevant case law, it had to consider the evidence admitted at trial before deciding whether there was a sufficient showing of good cause for an in camera review. The court also noted that it reread Devorah's testimony, and "did not see anything . . . that would support a review of [her] mental health records" at that time. The court stated, however, that it would wait to hear the other evidence presented at trial before making its ruling.

Prior to the prosecution's rebuttal case, defense counsel again raised the issue of an in camera review of Devorah's mental health records. Defense counsel asserted that, in addition to the reasons stated in the prior written motion, the evidence at trial

21

showed that Devorah "affirmatively lied" in her testimony about the sexual assault exam when she claimed that the nurse told her that she was "tore up" and "bleeding from her rectal area." In response, the trial court noted the scenarios described by defense counsel involved "very routine witness credibility issues that are issues of fact" for the jury. The court also found that there was no showing of a "nexus between . . . the witness testimony and hallucinations or schizophrenia or some other type of mental disease or defect" that would make Devorah's medical records probative on the issue of credibility. The court denied the request for an in camera review of Devorah's mental health records.

### 2.2 Governing law

A patient's mental health records are generally protected from discovery by the psychotherapist-patient privilege. (Evid. Code, § 1014; see *People v. Dworak* (2021) 11 Cal.5th 881, 912.) Under certain circumstances, however, "the mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive, recall or describe the events in question." (*People v. Gurule* (2002) 28 Cal.4th 557, 591–592.) At the pretrial stage of the proceedings, "psychiatric material is generally undiscoverable." (*Id.* at p. 592; see *People v. Hammon* (1997) 15 Cal.4th 1117, 1127–1128.) But during trial, "[w]hen a defendant proposes to impeach a critical prosecution witness with questions that call for privileged information, the trial court may be called upon . . . to balance the defendant's need for cross-examination and the state policies the privilege is intended to serve." (*People v. Hammon*, at p. 1127.)

22

To obtain an in camera review of a witness's mental health records during trial, a defendant must first establish good cause for their discovery.  (*People v. Reber* (1986) 177 Cal.App.3d 523, 531, disapproved on other grounds in *People v. Hammon*, *supra*, 15 Cal.4th at p. 1123.)  In this context, good cause "means the defendant must describe the records sought 'with reasonable specificity' and provide a 'plausible justification' for producing them."  (*People v. Dancer* (1996) 45 Cal.App.4th 1677, 1691, disapproved on other grounds in *People v. Hammon*, at p. 1123; see *People v. Madrigal* (2023) 93 Cal.App.5th 219, 257 [as part of a good cause showing for discovery of third party records, "defendant has the burden to show a 'plausible justification' for inspection"].)  If good cause is shown, the trial court reviews the records in camera, weighs the defendant's constitutional right to cross-examination against the statutory privilege, and determines which, if any, privileged material is essential to vindicate the defendant's constitutional right.  (*People v. Reber*, at p. 532.)  We review the trial court's ruling on the disclosure of privileged records for abuse of discretion.  (*People v. Dworak*, *supra*, 11 Cal.5th at p. 912.)

### 2.3   The trial court did not err in declining to review Devorah's mental health records

In this case, the trial court reasonably concluded that Johnson failed to make a good cause showing for an in camera review of Devorah's mental health records.  In seeking the disclosure of those records, defense counsel argued that there were inconsistencies between the forensic evidence and Devorah's account of the sexual assault, and that such inconsistencies "can be the result of a compulsion to lie and/or fabricate situations, to exaggerate incidents, and a myriad of other mental health issues

23

related to psychotic and/or hallucinatory behavior." Defense counsel also asserted that Devorah lied in her testimony when she stated that the nurse who conducted her sexual assault exam told her that she had tearing and bleeding in her rectum. The defense theory of relevancy thus appeared to be that, because there were conflicts in the evidence, Devorah may have either fabricated her claim that Johnson forcibly sodomized her or hallucinated the event due to an undisclosed psychiatric condition. This was insufficient, however, to show good cause for an in camera review of her privileged records.

As the trial court observed, the asserted inconsistencies between Devorah's testimony and the forensic evidence involved standard issues of witness credibility for the jury to weigh. But there was no showing that such inconsistencies were related to mental illness, or that Devorah had mental health issues that could affect her ability to perceive or recall the alleged sexual assault. Even if Devorah had been diagnosed with a mental or psychological condition, it is "a fact of modern life that many people experience emotional problems, undergo therapy, and take medications for their conditions. 'A person's credibility is not in question merely because he or she is receiving treatment for a mental health problem.' " (*People v. Anderson* (2001) 25 Cal.4th 543, 579; *Susan S. v. Israels* (1997) 55 Cal.App.4th 1290, 1297 ["although a witness's credibility is always in issue, this does not mean the defense is entitled to rummage through the medical records of every witness in a criminal prosecution looking for evidence to impeach the witness's credibility"].) While Devorah's credibility as the alleged victim of the charged sex offense plainly was at issue, the defense failed to demonstrate a nexus between her mental health and her credibility as a witness. On this

record, the trial court did not abuse its discretion or violate Johnson's constitutional rights in declining to conduct an in camera review of Devorah's mental health records.

**3.     Cumulative error**

Johnson argues the cumulative effect of the claimed errors deprived him of due process of law and a fair trial.  "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant.  [Citations.]  Although a defendant is entitled to a fair trial, he or she is not entitled to 'a perfect one.' " (*People v. Capers* (2019) 7 Cal.5th 989, 1017.)  Here, Johnson received a fair trial and has failed to show any cumulative error requiring reversal of his conviction.

### DISPOSITION

The judgment is affirmed.

VIRAMONTES, J.

WE CONCUR:

GRIMES, Acting P. J.

WILEY, J.